Garsh, J.
This claim arises out of a dispute over a request for proposals (“RFP”) for an electronic toll collection and management system (“ETTM”) put out by the defendant, Massachusetts Turnpike Authority (“MassPike”). Plaintiff AT/Comm, Inc. (“AT/Comm”) seeks a declaration that the RFP is invalid as it imper-missibly narrows common technical specifications for the ETTM, as set out in a Memorandum of Understanding (“MOU”) among several state agencies, thereby violating Chapter 273, Section 87 of the Acts and Resolves of 1994 (“Section 87”). The plaintiff also seeks an injunction preventing MassPike from awarding a contract under the RFP.[1] MassPike moves to dismiss this action pursuant to M.R.Civ.P. Rule *536 12(b)(6) on the grounds that it is apparent on the face of the complaint that the plaintiff lacks standing. For the following reasons, defendant’s Motion to Dismiss is allowed.
BACKGROUND
Section 87 requires MassPike, the Massachusetts Port Authority, the Department of Highways, and the Executive Office of Transportation and Construction (collectively, “the Agencies”) to “study and develop specifications and standards for a comprehensive, inter-agency-compatible electronic toll collection and traffic management system that shall encourage multiple bidders . . . Said system shall, to the extent feasible, be compatible with all non-electric toll and traffic management systems to be installed [by the Agencies].”
The MOU, which is signed by the Agencies and dated April 21,1995, sets forth a plan for an “interagency-com-patible” ETTM.[2] An interagency-compatible system is defined in the MOU as one “that is functionally interoperable between and among the various Transportation Facilities.” The MOU does not require that the specifications for each Agency procuring an ETTM be identical. Rather, it provides that an agency’s procurement of an ETTM “shall comply with the requirements for an ETTM System as specified in the ‘Common Technical Specifications for ETTM Systems’ and otherwise be functionally interoperable with any ETTM System of any other Party [the Agencies].” The Common Technical Specifications (“CTS”) “encompass the minimum acceptable parameters for the implementation of an ETTM system.” Any of the Agencies may propose additions to or modifications of the CTS, in which case the Agencies shall endeavor in good faith to agree unanimously.
Attached to the MOU is a Plan, which provides, as follows:
The “Common Technical Specifications for ETTM System" is the result of the above described cooperative efforts. The Massachusetts transportation agencies and authorities believe that the “Common Technical Specifications for ETTM Systems” can be met by multiple bidders, and are compatible with the non-electronic toll and traffic management systems installed or planned by such agencies.
Moreover, consistent with the requirements of Section 87, if any such agencies or authorities elect to procure an ETTM system, said agencies and authorities shall provide for an interagency-compati-ble ETTM System, which System will be functionally interoperable. Such functional interoperability will be achieved through the implementation of a single ETTM technology which will provide for an inter-agency-compatible ETTM System in accordance with the agencies’ and authorities’ understanding of the intent of Section 87 ... To that end, as the first procuring public agency, MassPike intends in ils upcoming ETTM System procurement to make provision for those agencies and authorities so requesting, whereby such agencies and authorities may in their discretion and to the extent permitted by law acquire units of the ETTM technology procured by MassPike. The agencies and authorities endorse Mass Pike’s intention in this regard.
In June of 1995, MassPike issued the RFP for an ETTM. The MOU (and CTS) is attached to the RFP. The RFP is, in some ways, more specific than the CTS. For example, the CTS “ETTM System Parameter” for “ETTM Account Validation/Verification” states: “To be handled separately by each Agency; Real-Time ETC Account Verification/Validation.” The RFP incorporates the required Real-Time specification and, in addition, specifies that ETTM account validation and verification shall be centralized through a comprehensive listing maintained in a lane controller. The RFP also states that transponder-based accounting and validation may be proposed so long as sufficient information is stored by the Toll Administrative Computer System in order to verify transponder balances. The complaint alleges that the requirement that the function of real time account validation be centralized is a design specification more restrictive than the functional requirements of the CTS.
The CTS “ETTM System Parameter” for “Transponder Type” states as follows: “Read/Write capability; Works with Read-Only system; Operating temperature (-20F to 158 F); Battery life of seven years preferred; Operating speed of 0 to 80 mph.” The CTS are silent as to capability for audiovisual features. The RFP, by contrast, states that certain audiovisual driver interactive features, such as lights, tones, and readouts, are “neither required nor desired.”
According to the complaint, AT/Comm develops, markets, and maintains systems for electronic toll collection and traffic management. AT/Comm pioneered and patented what it calls a “third generation” technology known as “smart transponder” technology, referring to the use of a microcomputer chip, display, audio speaker and keypad on a small device residing on a vehicle’s dashboard. AT/Comm submitted both a bid in full compliance with the RFP as well as an alternative bid “encompassing the full range of its own smart transponder technology.” AT/Comm’s patented “smart transponder” technology uses a decentralized system, but it can function and act as a centralized system. AT/Comm’s technology is capable of certain interactive, audiovisual features “neither required nor desired” by the RFP.
AT/Comm’s compliant bid is approximately three to four million dollars more costly than its alternative bid. According to the complaint, by excluding “smart transponder” technology and specifying centralized validation and account processing, MassPike has effectively eliminated technologies and systems that otherwise are viable under, and comply with, the CTS. As a result, according to the plaintiff, all of the parties to the Memorandum lose the flexibility of reviewing the full range of currently available technology, at different costs, afforded to them under the CTS.
*537 The complaint concedes that the primaiy objective of Section 87 is that any system developed be interoperable among the Agencies. It alleges that the Agencies, byway of the MOU, have agreed that the best way to achieve that goal is through the CTS. Accordingly, AT/Comm argues, the legal standard by which to measure the RFP is compliance with CTS. At/Comm contends that MassPike, by “impermissibly narrow[ing]” the CTS, has failed to comply with the MOU and, in turn, Section 87.
DISCUSSION
When evaluating the sufficiency of a complaint pursuant to Mass.R.Civ.P. 12(b)(6), the allegations of the complaint and any permissible inferences are to be drawn in the plaintiffs favor. Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429(1991). A“complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle him to relief.” Nader v. Citron, 372 Mass. 96, 98 (1977), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957). All inferences should be drawn in the plaintiffs favor, and the complaint “is to be construed so as to substantial justice . . .” Ourfalian v. Aro Mfg. Co., 31 Mass.App.Ct. 294, 296 (1991).
The foundation for plaintiffs claim of standing is the erroneous assumption that it is entitled to the same standing that has been afforded to bidders seeking to secure compliance by public entities with competitive bidding statutes. A bidder has standing to bring a claim based on an awarding agency’s alleged failure to follow bidding procedures set forth in, and required by, G.L.c. 149, §§44A-H, the statute establishing a competitive bidding process for contracts for the construction of public buildings or G.L.c. 30, §39M, the statute governing contracts for the construction, reconstruction, alteration, remodeling or repair of any public work. E.g., Modern Continental Construction Co. v. Lowell, 391 Mass. 829, 835-836 (1984); Andover Consultants, Inc. v. Lawrence, 10 Mass.App.Ct. 156 (1980). Similarly, a bidder on a contract governed by G.L.c. 7, §22, the general procurement statute, has standing to challenge the compliance of the awarding authority with the requirements of that statute. Datatrol, Inc. v. State Purchasing Agent, 379 Mass. 679, 690 (1980).
Neither G.L.c. 149, §44A et seq. nor c. 30, §39M apply to the RFP because it does not require construction, alteration or repair of a public work or building. At/Comm does not contend that the RFP violated the general procurement statute, G.L.c. 7, §22.[3] Indeed, if MassPike had issued as its RFP only the “minimum acceptable parameters” as set forth in the CTS, and nothing more, thus allowing AT/Comm to propose its “third generation” technology and other bidders to propose their “second generation” technology, MassP-ike very well might have run afoul of the requirement that bids be specific enough to ensure that all of the bidders can be evaluated on a common footing. Id. at 699. “Where . . . each bidder is invited to bid upon his own specifications, it is plain that there can be no real competition between such bidders. Such an advertisement not only destroys competition, but gives . . . officials an opportunity to exercise favoritism in awarding contracts ... To allow a bidder to furnish his own specifications for any material part of the contract in question would destroy genuine and fair competition and be subversive of the public interests.” Sweezey v. Mayor of Malden, 273 Mass. 536, 542 (1931) (specifications stating the thickness of the layer of pavement, but not the composition or manner of laying the wearing surface, violate bidding ordinance).
Section 87 bears no resemblance to those statutes that have been construed to provide standing to a bidder to seek compliance with the bidding procedures mandated by those statutes. Such statues have as their purpose the securing of honest and open competition — the prevention of fraud and favoritism. Each such statute contains detailed provisions governing the bidding process.
For example, G.L.c. 149, §44A states that “every contract for the construction, reconstruction, installation, demolition, maintenance or repair of any building by a public agency estimated to cost more than twenty-five thousand dollars . . . shall be awarded to the lowest responsible and eligible general bidder on the basis of competitive bids in accordance with the procedure set forth in the provisions of sections forty-four A to forty-four H, inclusive. ” It mandates an award of such contract within thirty days after the opening of the bids and lays out the exceptions to this provision. Sections 44B to 44G regulate, in detail, bid deposits, certificates of eligibility for bidders, the filing of general bids, and the contents of each contract. Chapter 30, §39M is similar. Chapter 7, §22 provides that the Commissioner of Administration of the Executive Office for Administration and Finance shall make rules and regulations governing the manner and method of procuring, including contracting for, supplies, equipment, and other property for the various state departments, offices, and commissions. It contains numerous subsections describing what must be included in the regulations, such as the advertisement for and receipt of bids, the stimulation of competition, the times for submitting estimates for various supplies, and the standardization of the forms for estimates, orders, and contracts. See also 802 CMR2.00 etseq.
Section 87 is quite different. It provides, as follows:
The [Agencies] shall. . . study and develop specifications and standards for a comprehensive, inter-agency-compatible electronic toll collection and traffic management system that shall encourage multiple bidders; provided, however, that such study and plan shall not preclude a system supplied or purchased from one manufacturer or vendor.[4] Said system shall, to the extent feasible, be compatible with all non-electric toll and traffic man *538 agement systems to be installed by the [Agencies] . . . [The Agencies] shall not purchase or implement an electronic toll collection or traffic management system that is not compatible, under said plan.
Section 87 does not purport to govern the actual bidding process. The mere mention in the statute that the plan developed by the Agencies shall “encourage multiple bidders” does not a competitive bidding statute make.[5]
No express cause of action is contained in section 87. Whether or not a statute creates an implied private cause of action is "basically a matter of statutory construction.” Unitrode Corp. v. Dynamics Corp. of America, 379 Mass. 487, 491 (1980) (target company has no standing to maintain an action for equitable or injunctive relief for alleged violations of the Massachusetts Take-Over Act), quoting Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 15 (1979). The parties point to no history, clear- or otherwise, evidencing a legislative intention as to the creation by implication of a new cause of action. Id. at 492. In Transamerica, the U.S. Supreme Court implied a private right of action in a statute that set out federal fiduciary standards governing the conduct of investment advisers because the statute declared certain contracts void, which the Court found necessarily contemplated that the issue of voidness be litigated. “A person with the power to void a contract ordinarily may resort to a court to have the contract rescinded and to obtain restitution of consideration paid.” Transamerica Mortgage Advisors, Inc., 444 U.S. at 18. Section 87 has no similar consequences. A person interested in doing business with the Commonwealth ordinarily may not resort to a court to adjudicate its recommendations as to what the state should purchase. It is highly unlikely that the Legislature intended that a private party could litigate whether or not a system being bid would result in interagency compatibility when the Agencies concerned do not choose to assert such claims. The Agencies are capable of asserting such rights themselves.
Moreover, a party only “has standing when it can allege an injury within the area of concern of the statute . . . under which the injurious action has occurred.” Massachusetts Ass ’n of Independent Insurance Agents & Brokers v. Commissioner of Insurance, 373 Mass. 290, 293 (1977). The injury alleged to have been suffered by AT/Comm — its inability to bid its smart transponder technology in its “native and unmodified state” — is not an area of concern of the Legislature.
The fact that AT/Comm would be more likely to secure the contract with MassPike if all the features of its “smart transponder” bid were required and desired does not confer standing. “Normally, an injury derived from business competition is not sufficient to confer standing.” Id. at 293. AT/Comm has no special standing given to it by statute to proceed against MassPike to protect its own interest in selling its “third generation” technology to the Commonwealth. In effect, the plaintiff is alleging that by depriving it of a competitive advantage vis-á-vis “second generation” technology bidders, it is injured because it faces the same risk of not being selected that each of the “second technology” bidder faces. That injury has nothing whatsoever to do with interagency compatibility, and AT/Comm is not alleging a violation of a competitive bidding statute designed, in part, to protect its interests. Cf. Nantucket Boat, Inc. v. Woods Hole, Martha’s Vineyard & Nantucket Steamship Authority, 345 Mass. 551, 554 (1963) (plaintiff did not have standing to bring allegation that authority unlawfully intended to license vessel to compete with plaintiff); Springfield Hotel Ass’n v. Alcoholic Beverages Control Comm’a 338 Mass. 699, 703 (1959) (“The fact that a petitioner may suffer from business competition gives him no standing”).
In any event, “[a]n injury alone is not enough; a plaintiff must allege a breach of a duty owed to it by the public defendant.” Town of Northbridge v. Town of Natick, 394 Mass. 70, 75 (1985). See also Circle Lounge & Grille, Inc. v. Board of Appeal, 324 Mass. 427, 432 (1949) (The “general rule in this Commonwealth [is] that violation of law commonly gives rise to no private right of action unless there is also a violation of some private right or duty”). Section 87 was enacted to allow the Agencies to work out for themselves a plan for interagency compatible ETTMs. Nothing in the statute requires that such a plan go further than establishing “minimum parameters.” Section 87 does not require that the Agencies develop a plan that is as detailed as a request for proposals. The statute does not create an otherwise nonexistent duty to allow the plaintiff to bid whatever technology with whatever features it desires.
Although the essence of the complaint is that the RFP impermissibly narrows the CTS, AT/Comm does not, for good reason, purport to predicate standing upon the MOU itself. Because “the agreement is neither signed by [AT/COMM] nor any other [potential bidder] and makes no reference to serving the interests of any party other than the agencies involved ... no rights of enforcement are conferred on” the plaintiff.[6] Town of Northbridge v. Town of Natick, 394 Mass. at 75. Moreover, the MOU itself specifically states, “No right or benefit is intended to be conferred on anyone not a party to this MOU.”
In sum, Section 87 does not expressly or by implication create a private cause of action, and the alleged injury of the plaintiff is not within the area of concern of the statute. The MOU provides no independent basis for standing. The requirement of standing is not avoided by a prayer for declaratory relief. Doe v. Governor, 381 Mass. 702, 704 (1980).
ORDER
For the foregoing reasons, it is hereby ORDERED that the Massachusetts Turnpike Authority’s Motion to Dismiss be ALLOWED.

Plaintiffs motion for a preliminary injunction was denied.

The MOU and the RFP are attached to the complaint.

AT/Comm argues that, under MassPike’s reasoning, the Agencies would be “beyond reproach” because no aggrieved *539 bidder could ever challenge any action of the Agencies procuring an ETTM, no matter how outrageous. Section 87 does not, however, purport to supplant protections provided by any other statute that may apply. The procurement statute is intended “to sweep broadly and encompass property not known in 1922." Datatrol, Inc. v. State Purchasing Agent, 379 Mass. at 694 (G.L.c. 7, §22 applies to the purchase of sophisticated electronic equipment).

At/Comm does not allege that the MOU or the RFP precludes a system supplied or purchased from" it. In fact, At/Comm alleges that it has submitted a compliant bid.

There is no allegation that the RFP did not result in multiple bidders.

Plaintiff does not have standing as a third party beneficiary to the MOU. At most, AT/Comm is an “incidental” and not an “intended” beneficiary to the agreement, without right to sue. Town of Northbridge, 394 Mass. at 76 n.3.